UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 04-40113-FDS

| | | |
|---|---|---|
| ELIZABETH R. STEFFENBERG, | ) | (BBO#639293) |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| T. GENE GILMAN, STEVEN GILMAN, | ) | |
| THE GILMAN INSURANCE | ) | |
| AGENCY, INC., DAVID M. SCOLL, | ) | |
| ARBOR SECURITIES, LTD., | ) | |
| ALLIANCE INVESTMENT | ) | |
| MANAGEMENT, COMMONWEALTH | ) | |
| FINANCIAL HOLDINGS INC., | ) | |
| FINANCIAL LINKS, INC., | ) | |
| T. GILMAN & CO., LTD., | ) | |
| FIRST ALLIED SECURITIES, INC., | ) | |
| PENSON FINANCIAL SERVICES, INC., | ) | |
| AVIVA USA CORPORATION, | ) | |
| TRADETEK, LTD., and | ) | |
| TRADETEK, LLC, | ) | |
| Defendants. | ) | |

---

## MOTION OF PLAINTIFF, ELIZABETH R. STEFFENBERG, TO FILE MEMORANDUM IN REPLY TO THE OPPOSITION OF DEFENDANT, DAVID M. SCOLL TO PLAINTIFF'S MOTION TO COMPEL

Pursuant to Local Rule 7.1(B)(3) of the Local Rules of the United States District Court

for the District of Massachusetts, Plaintiff, Elizabeth R. Steffenberg ("Mrs. Steffenberg"), hereby

submits this Motion for Leave to File the Memorandum in Reply to the Opposition of Defendant,

David M. Scoll ("Scoll") to Mrs. Steffenberg's Motion to Compel Responses to Plaintiff's First

Request for Production of Documents ("Motion to Compel") which is attached hereto as

Exhibit A.

Mrs. Steffenberg has set forth her position and the applicable law in her Motion to

Compel, and does not seek in her Reply Memorandum to reiterate those arguments.  However,

Scoll has raised a number of new arguments in his Opposition which Mrs. Steffenberg seeks the

opportunity to address.

> Respectfully Submitted,
> ELIZABETH R. STEFFENBERG
> By Her Attorneys,
>
>
> Louis M. Ciavarra, Esquire (BBO #546481)
> Christine S. Collins, Esquire (BBO #639293)
> Bowditch & Dewey, LLP
> 311 Main Street
> P.O. Box 15156
> Worcester, MA  01615-0156
> (508) 926-3441
> (508) 929-3041

Dated:  October 20, 2004

## CERTIFICATE OF SERVICE

I, Christine S. Collins, hereby certify that I have this 20th day of October, 2004 served
the foregoing by mailing copy thereof, via first class mail, postage prepaid, to all parties and
counsel of record.

Christine S. Collins

04-40113-FDS

{J:\CLIENTS\lit\303603\0001\00480085.DOC;1}

# EXHIBIT A

{}

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 04-40113-FDS

| | | |
|---|---|---|
| ELIZABETH R. STEFFENBERG, | ) | (BBO#639293) |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| T. GENE GILMAN, STEVEN GILMAN, | ) | |
| THE GILMAN INSURANCE | ) | |
| AGENCY, INC., DAVID M. SCOLL, | ) | |
| ARBOR SECURITIES, LTD., | ) | |
| ALLIANCE INVESTMENT | ) | |
| MANAGEMENT, COMMONWEALTH | ) | |
| FINANCIAL HOLDINGS INC., | ) | |
| FINANCIAL LINKS, INC., | ) | |
| T. GILMAN & CO., LTD., | ) | |
| FIRST ALLIED SECURITIES, INC., | ) | |
| PENSON FINANCIAL SERVICES, INC., | ) | |
| AVIVA USA CORPORATION, | ) | |
| TRADETEK, LTD., and | ) | |
| TRADETEK, LLC, | ) | |
| Defendants. | ) | |

## REPLY MEMORANDUM OF PLAINTIFF, ELIZABETH R. STEFFENBERG, TO THE OPPOSITION OF DEFENDANT, DAVID M. SCOLL, TO MRS. STEFFENBERG'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS

Plaintiff, Elizabeth R. Steffenberg ("Mrs. Steffenberg"), hereby submits this Reply Memorandum to the Opposition of Defendant, David M. Scoll ("Scoll") to Mrs. Steffenberg's Motion to Compel Reponses to Plaintiff's First Request For Production of Documents (the "Opposition").

In his Opposition, Scoll claims that he may not waive the attorney-client privilege between himself and his clients, Defendants, T. Gene Gilman ("Gilman") and Gilman's corporate entities, because the privilege is Gilman's -- and Gilman's alone -- to waive. Because

{J:\CLIENTS\lit\303603\0001\00480086.DOC;1}

Gilman has not appeared in this action nor produced any responsive documents, Scoll maintains, Gilman has not waived the privilege. Since Scoll's Opposition was filed, in an abundance of caution, counsel for Mrs. Steffenberg sent a letter to Gilman's counsel asking whether Gilman intended to assert the attorney-client privilege and giving him yet <u>another</u> opportunity to do so, a true and accurate copy of which is attached hereto as <u>Exhibit 1</u>. To date, Gilman has not invoked the privilege. <u>See</u> Second Affidavit of Louis M. Ciavarra ("Ciavarra Affidavit") at ¶¶ 3-4, filed herewith. Accordingly, Scoll is no longer in a position to assert the privilege for Gilman and therefore, production of the requested materials is proper.

Furthermore, Scoll contends that Mrs. Steffenberg has not demonstrated how obtaining Scoll's file would be significant to her claims. Although discovery in this case is at its initial stages, Mrs. Steffenberg has evidence which demonstrates that Scoll was intimately involved with Gilman. Specifically, attached hereto as <u>Exhibit 2</u> and to the Ciavarra Affidavit at ¶ 5 is a true and accurate transcript of a joint presentation made by Gilman and Scoll to all of the members of the Steffenberg family -- less one Steffenberg son who was unable to attend the meeting -- in or about 1997 concerning the Steffenbergs' estate plan. The transcript demonstrates, among other things, that (1) Gilman and Scoll worked together, (2) Scoll <u>knew</u> of Gilman's investment activities to at least some degree, (3) the Steffenbergs <u>thought</u> Scoll and Gilman worked as a "team", and (4) the Steffenbergs held Gilman and Scoll in very high regard and placed an inordinate amount of trust in both of them. This conversation clearly evidences the import to Mrs. Steffenberg of the client material that Scoll has in his possession and is refusing to produce to her in this case. Its disclosure is clearly warranted.

Finally, Scoll's position that <u>every</u> document in his file relating to Gilman is protected from disclosure, as evidenced by his recently-produced privilege log, misconstrues the scope of

the privilege's protections. The attorney-client privilege "ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle." In re Ampicillin Antitrust Litigation, 81 F.R.D. 377, 384 (D.D.C. 1978) (emphasis added). The relationship does not create an automatic "cloak of protection. . . draped around all occurrences in conversations which have any bearing, direct or indirect, upon the relationship of the attorney with his client." In re Fidelity Guarantee Mortg. Corp., 150 B.R. 864, 869 (Bankr.D.Mass. 1993) quoting United States v. Goldfarb, 328 F.2d 280, 281 (6th Cir. 1964). It therefore defies logic and common sense that each and every document in Scoll's file relating to Gilman is privileged, and Scoll's purported "descriptions" of the individual documents in his privilege log are so broad that it is impossible to ascertain whether or not the privilege applies. At a minimum, Scoll should be required to provide the documents for this Court's review on an in camera basis.

Accordingly, Mrs. Steffenberg respectfully requests that this Court require Scoll to produce all documents responsive to her document requests as set forth in her previously-filed Motion to Compel and the accompanying Memorandum of Law.

Respectfully submitted,

ELIZABETH R. STEFFENBERG

By Her Attorneys,


Louis M. Ciavarra, Esquire (BBO #546481)
Christine S. Collins, Esquire (BBO #639293)
Bowditch & Dewey, LLP
311 Main Street
P.O. Box 15156
Worcester, MA  01615-0156
(508) 926-3441
(508) 929-3041

Dated:  October 20, 2004

## CERTIFICATE OF SERVICE

I, Christine S. Collins, hereby certify that I have this 20th day of October, 2004 served the foregoing by mailing copy thereof, via first class mail, postage prepaid, to all parties and counsel of record.


Christine S. Collins

# EXHIBIT 1

{}

# Bowditch
# &Dewey
ATTORNEYS

Direct telephone: (508) 926-3408
Direct facsimile: (508) 929-3011
Email: lciavarra@bowditch.com

*Via Facsimile and First Class Mail*
*(617) 338-9911*

October 7, 2004

Thomas M. Hoopes, Esq.
Kelly, Libby & Hoopes, P.C.
175 Federal Street
Boston, MA 02110

**Re:**   **Elizabeth Steffenberg v. Gene Gilman, et al.**
        **United States District Court CA #04-40113-FDS**

Dear Mr. Hoopes:

From our prior conversations, I understand that you represent Mr. Gilman. In connection with the above-referenced litigation we have been attempting to obtain necessary and relevant information from Attorney Scoll. Attorney Scoll has asserted the attorney-client privilege as a basis for refusing to provide us with this information. The privilege belongs to Mr. Gilman and the companies that he controls. To date, neither you nor he have asserted that privilege, and we have represented this fact to the Court. Nevertheless, Attorney Scoll has continued to assert your clients' privilege. Because this matter is now pending before the Court, if I do not hear from you by Tuesday, October 12, I will assume that there is no objection and I will again represent this fact to the Court.

Very truly yours,

Louis M. Ciavarra

LMC/jcn

BOWDITCH & DEWEY, LLP  311 MAIN STREET  PO BOX 15156  WORCESTER, MA 01615-0156
T 508 791 3511  F 508 756 7636  www.bowditch.com

*Boston  Framingham  Worcester*

```
                  *********************
             ***    TX REPORT    ***
                  *********************


TRANSMISSION OK

TX/RX NO                   4735
CONNECTION TEL                          ##74166#
SUBADDRESS
CONNECTION ID
ST. TIME                   10/07 17:18
USAGE T                    00'41
PGS.                         2
RESULT                     OK
```

## Bowditch &Dewey
### ATTORNEYS

Direct telephone: (508) 926-3408
Direct facsimile: (508) 929-3011
Email: lciavarra@bowditch.com

## FACSIMILE TRANSMITTAL SHEET

| TO: | | | |
|---|---|---|---|
| Thomas M. Hoopes, Esq. | | **FAX NUMBER:** (617) 338-9911 | **PHONE NUMBER:** (617) 338-9300 |

| DATE: | |
|---|---|
| October 7, 2004 | |

| FROM: | |
|---|---|
| Louis M. Ciavarra, Esq. | **TOTAL NO. OF PAGES INCLUDING COVER:** two (2) |

| RE: | |
|---|---|
| Steffenberg v. Gilman, et al. | **CLIENT/MATTER NUMBER:** 303603.0001 |

☐ URGENT   ☐ FOR REVIEW   ☐ PLEASE COMMENT   ☐ PLEASE REPLY   ☐ PLEASE RECYCLE

Kindly reference the attached correspondence.

# EXHIBIT 2

{}

## STEFFENBERG FAMILY MEETING

It's on.

As you can hear the first argument before you put the tape on....

You would have enjoyed all of our conversations about all these confusing ....

Wait a minute I don't know what he's doing on the computers....LAUGHTER

I thought we were going to stop talking about AJ when this thing went on...
LAUGHTER

Did you have a speech?

No ....

?:        Okay is the something you want to say for the record?

MR. STEFFENBERG:        No I just said that we picked you gentlemen because of your experience and my trust in you and this whole thing was done to be fair and not hurt our children in the future so that's why we did it this way. So that's all I wanted to say. These gentlemen ask of me if we want our three children here I'm sorry the third one couldn't make it. But we're here. It's your meeting you set the tone. If you want to say its okay to ask questions or if you want to go through it and have questions at the end. It's up to you guys.

GILMAN:        Well I think this is ....it's really...it's more a question and answer thing and an opportunity for you to meet us and A.J. we look forward to meeting you in the future. So maybe we should start the program off by letting David explain somewhat about the legalities of how this has been designed and then I'll just talk somewhat about how we structure the investment programs and then its an open forum for you guys to ask some of the questions you have and you'll probably go away thinking why didn't I ask this and why didn't I ask that so you know, we'll give you a telephone number you and are always welcomed to call. Okay and if you got a hot stock tip, please call and let us know about that. LAUGHTER.

And put that on speed dial ! (Laughter)

GILMAN:        Yeah. Yeah absolutely.

Yes because we have opportunities like megabucks...

SCOLL:        A.J. This is David Scoll. I am the legal side of this. My purpose in all of this is more to provide protection than to grow the funds or to make money. I am supposed to keep things from throwing out the windows and going to the tax man. What

we have done for your parents is provide an estate plan. Each of them has a Will, a Living Trust, a Durable Power of Attorney, A Health Care Proxy and there is an irrevocable Life Insurance Trust and there is a Homestead. To explain all these in terms – you know what a Will is and you probably have some idea of what a Trust is. I will skip over those for a moment. We also have Durable Powers of Attorney. These are documents which allow people to do finances for someone who is incapacitated. To pay their bills, to collect money, to give gifts to essentially be them while they are unconscious but still living. After they have died their Will takes over. They have also executed Health Care Proxies. These are documents by which a person gives someone the authority to act for them in medical terms if they are again incapacitated and unable to give directions themselves. I suggest all of these documents for you people as well. If you haven't got them already, you should have them. The Homestead is simply a piece of paper which is filed in the Registry of Deeds to protect the value of your home. If you are under age 62, one of the couple or a single person owning a home can file a Homestead and protect $100,000.00 in equity. If you are over 62, it becomes $200,000.00 of equity. Now we go back to the other portions. The Will and the two Trusts. Each of your parents has a Will. The Will in fact won't amount to much because most of the assets will be held in Trust. The Will will simply pass whatever remaining other assets remaining your parents' sole names, their names alone, to one or another of the Trusts.

As you know, your father did very well in his life and he sold out of the business and he made a bundle of cash. There are a lot of people who would like to get their hands on that cash including the federal government (inaudible) in escrow. So we have done some things to try to keep the government at bay as much as possible. And one of these things is to develop Trusts. Each of your parents has a Trust and each of them will have assets in the name of the trust or in their own name which will go into the Trust. What the Trust does, I don't know if you are aware of this but each person can pass along to whoever, $600,000.00 free of estate tax and each person has that singular $600,000.00 life time exemption and it's a gift and estate tax exemption. So if you give gifts during the life time, it can eat up that $600,000.00 exemption unless and only if, rather you give more than $10,000.00 per year. There is a $10,000.00 cut off per person per year. So if I give you $10,000.00 a year I'm okay. If my wife and I give you $20,000.00 a year, excuse me, as a joint gift it's.......(other people join in with laughter etc...)

?:      It's alright Dave, you're doing all the talking. Do you want to take a break?

SCOLL:      So if my wife and I give you $20,000.00 that's because it's a joint gift. And as long as we keep it under that $10,000.00 maximum we don't knead into the $600,000.00 life time exemption. Now Congress is talking about raising that to $750,000.00. It has been $600K for the last ten years. It has not gone up with inflation. So there probably will be a change and it will probably take place in the next year or two. So there may be some additional tweaking that we will do at some of these things encounter. Basically what we are doing is trying to provide a mechanism whereby we can set aside $600,000.00 on the death if either one of you pass. In order to do that...let me back up a second...if you go over the $600K mark and if all of a sudden you start

running into federal and state taxes which can be pretty steep, anywhere from about 35 to 60% of the money, you can pass all of your assets to your spouse tax free. But when your spouse dies that's where the tax hits. So what we try to do is at the death of the first spouse take $600K – we take the maximum under the law – set it aside in a separate account. It doesn't belong to the surviving spouse. It belongs to the Trust. That is why we set up the Trusts. The Trust has two owners. The Trustee, the person who runs it and the Beneficiary, the person who is supposed to benefit from the Trust. Between these two persons they have ownership of the Trust and the assets in the Trust. The Trustee normally doesn't, well in our case, we don't get anything out of it except the administration fees. The Trustee of the Trust that we have set up are in the first instance the parents, where appropriate. The Trust, now this money that has been set aside will be for the benefit of the surviving spouse so long as that spouse is alive and after that it gets distributed to the children. Okay.

So far so good.

Any questions?

?:        Too much gone over.

LAUGHTER.

SCOLL:        So you're into the period of the payoff from the Trust.

Sure.

SCOLL:        Okay?

MRS. STEFFENBERG:  You could explain it better than I could if I had to.

SCOLL:        The Trust that I'm talking about now are the so-called inter vivos or lifetime trusts that is being set up now and it will hold some of the properties that your parents own and will become really effective upon their deaths. The Trusts say that on the death of the last of them to die because they'll need the money for their support until they die. On the death of the last to die, there will be a distribution to the children who are still living of one-third. Five years later they will get a second-third and five years after that they get the final third so it will be the entire amount over the course of ten years. There is a second trust. It's an Irrevocable Life Insurance Trust which was set up because no matter what happens there is going to be some substantial estate taxes and we have to find some way to pay them. So we have done is set up an Irrevocable, one that can't be changed Trust, Gene which and I are the trustees, which is funded with life insurance and on the death of the second to die, this life insurance will pay out and the instruction to the trustees is that we are to give the money to the estates that need to pay taxes and the last illness, expenses etc. the administration expenses of the state and whatever is left over will then be distributed to the children equally. This is the basis, or the reason for these so-called Crummey letters that you get around Christmas each year.

What happens is your parents sign a check to a Trust every year to pay the premium on the life insurance. The law allows us to accept that as a gift and to use that to pay the premium but because of the particular set up because you guys are basically the beneficiaries we have to give the beneficiaries the right to take out $5,000.00 or 5% each year giving a period of anywhere from 30 to 45 days to do so and you have the absolute right to do so. However, if you do so, you can't pay for the life insurance (?). But that's why I send you those letters and that's why I ask you to sign them so that if it should ever be questioned by the IRS I can go back in the file and say look we made the offer that was declined and I have the letter here in the file.

MR. STEFFENBERG:      David, maybe we should say when we are going and the insurance comes up an administrative and whatever cost the tax is has to be deleted from that. There's going to be a sizable amount for the children.

SCOLL:      There's going to be a chunk.

MR. STEFFENBERG:      Ya. I mean I just want them to think that all that stuff is going to go. They're going to be taken care of.

GILMAN:      I think you should add that the reason it was set up that way is because the reason they were irrevocable is that it bypasses the estate so that it's pure and that's the whole reason why we designed it that way.

SCOLL:      Ya. The insurance money does not get taxed, the estate tax level, and that's why its there, to pay whatever estate taxes are incurred by the estate in general and to be another source of monies and it will be a chunk.

GILMAN:      But, that's the major reason that's if we just designed it where there was life insurance and he died and it goes into the estate then those percentages David had talked about earlier 35 to 60% would have been eaten up to the federal government and so by designing it this way the proceeds are pure. 100%. So it makes it really important that we stay tuned to doing the letters the way we do it and not ... (inaudible)

?:      Your light's not flashing.

?:      It's voice activated. Ok so we have to speak loud enough to get the light to blink.
Cough.
Oh, It's blinking. LAUGHTER.

SCOLL:      Any questions so far?

We – the basic thing to remember is that we're setting this up, we have set all this up in order to avoid taxes so far as possible, in order to make sure that as much of your parents' wealth is passed to the children as can be and I can assure you that it is set up so that your parents definite intention to make sure that everybody is treated equally and there are

provisions in there so that anything that has taken place prior will get evened out (uhum) in the wash.

?:    That's good.

GILMAN:    Ok, I think that's important to understand that it's always going to be one third. One-third, one third, regardless of any gifts that are made in advance and if any child should die before the parents, that child's portion will go to that child's children or if they die without children it will go to the other two children.

?:    So it either goes down a level or it goes across.

NANCY MALOUGHNEY:  It doesn't go to the spouse it goes to the grandchildren?

GILMAN or SCOLL: This is all by blood.

?:    Right.

      Ok.

      Ya.

SCOLL:    Any questions so far?

NANCY MALOUGHNEY:  I'm sorry, I just thought of something.

That's ok.

NANCY MALOUGHNEY:  Does it go to the oldest child, oldest grandson, great grandchild, you know, my oldest child?

SCOLL:    Evenly.

NANCY MALOUGHNEY:  Oh, evenly.

SCOLL:    So if you have two children, then your portion gets divided in two.  If you have three, it gets divided in three.

NANCY MALOUGHNEY:  Ok.

SCOLL:    Equally, per child.

?:    Uhum.

NANCY MALOUGHNEY:  Is that Latin,

SCOLL:        Yes.

LAUGHTER,
It sounds Latin.

MR. STEFFENBERG:        What about the real estate, if we are gone, the real estate
that we own.

GILMAN or SCOLL: The real estate that you own becomes part of your estate so that ...
At this point, what happens is that the real estate just gets sold and the assets , the net
sales proceeds get dumped into the estate and divided equally.

GILMAN:     So you have to decide obviously if you want to sell them right?  I mean
lets take Maine as a group in a sense it's owned a third by each one of you.

?:        Right.

GILMAN:     So if you decide as a family that you prefer to keep it then you know you
all own a third of it.  It would be shifted as accordingly.  It doesn't have to be sold.  These
are all of your assets you will then have ownership of, a third each, our job is really to
guide you, you know all we are doing with your parents is to suggest ways of doing
things.  They have had the problems of deciding how, so they actually spent an enormous
amount of time to design this thing in your benefit, to the best benefit for all three of you.
I mean hours and hours of work have gone into getting this to a stage where they know
that you are all going to be protected in a sense.  It has been a long time to
develop.......we think we got it in line for you and our job is then going to be able to look
at you guys and say okay they did such a wonderful job now we'll suggest to you
because this is now another world how you then should accept it and then in your best
interest what you should be doing.  Then you have to decide where it is really going to be
your decision you know they trust that you'll be doing the right things here ... not take
their work for that generation (inaudible) so you know our job is to say hey (inaudible)
here is the best way to start doing something.

Are you finished on the legal side or do you want...........

SCOLL:      I think I'm about there.

GILMAN:     Okay, so let's answer some questions ... go ahead.

NANCY MALOUGHNEY:  I'm sorry.  On the Health Proxy part uhm...I remember
signing the document or my name was put down because ....okay.  Just explain it a little
bit.  I know there is no living will in this state correct?

SCOLL:      Correct.

NANCY MALOUGHNEY: Okay. So can you review please the health proxy, what it means and how it works?

SCOLL:       It is actually set up by statute. In a form follows the wording in the statute and what it does is that it just gives you or whoever has been giving the proxy. I think it was....

NANCY MALOUGHNEY: It goes down the line.

Yeah, yeah. It goes down the line. I think you're second on both of them.

NANCY MALOUGHNEY: The surviving spouse is first and then.........

?:       I'm sorry, it's says Nancy Maloughney and then..........

Right.

NANCY MALOUGHNEY: Okay.

SCOLL:       It just means that you get to step in if one of your parents are in a coma they will request a medical decision to be made. You show the piece of paper to the doctor in the hospital and tell them I have this right to make the decision and tell me what the facts are.

NANCY MALOUGHNEY: And we probably need them to give us a clue ...

SCOLL:       Yes. Yes that's important that you need to talk about what your...........

ALL PEOPLE TALKING AT ONCE

GILMAN:       Unfortunately, it is hard to hear that it is as easy as that. There is ....in my wife's mother's case it was a question of whether or not to use antibiotics. Whether it was going to prolong her life or cause her some more discomfort. Are you going to use a morphine drip. Your mother used that morphine drip to do away with pain.

NANCY MALOUGHNEY: But that wasn't terminal. It was after surgery.

MR. STEFFENBERG:       She hit a couple of times too much and she was in la la land.

LAUGHTER – nothing wrong with that!

NANCY MALOUGHNEY: She had a bad reaction to that.

MR. STEFFENBERG:       Yeah. I mean she was whoo whoo. She was somewhere else.

GILMAN:     See in my case I got it designed so that they strap me into a hand glider and push me off the top of Mt. Washington and I'm going to go out singing (LAUGHTER) so you know everybody has a little different way of doing it.

MRS. STEFFENBERG:     Kind of like that cowboy … what was the movie the Bombay…….

?:     Dr. Strangelove.

MRS. STEFFENBERG:     Yeah he goes flying out _____- Slim pickings.

MR. STEFFENBERG:     It was like Sam when his wife passed away and she wanted to be cremated and her ashes thrown in the ocean up there in Maine in front of their house and Sam honored that. He did do that. He walked down to the rocks and almost fell down

LAUGHTER

MR. STEFFENBERG:     He said I almost broke my leg trying to get out of there!

GILMAN:     This is on tape. Send this down to Sam you know.

MR. STEFFENBERG:     Then he swam around and that was it so.

NANCY MALOUGHNEY: (inaudible) where she got me again.

LAUGHTER.

MRS. STEFFENBERG:     Does that answer your question, Nancy?

NANCY MALOUGHNEY:  Yeah well it's…..yeah we have already talked a little on that. (inaudible) you want to be hooked up to every single thing possible.

MR. STEFFENBERG:     Yeah, I want to be frozen.

NANCY MALOUGHNEY:  Dad!

MR. STEFFENBERG:     Because if they may figure out how to fix it later.

?:     You just want to meet Walt Disney.

MR. STEFFENBERG:     Right. He's there. Whatever he dies from there might say, oh there is a pill for that okay. Put him in the oven.

MR. STEFFENBERG:     Nancy dear, we will straighten this out. Don't worry.

NANCY MALOUGHNEY: I'm not. LAUGHTER.

MRS. STEFFENBERG:      Okay. Thank you. There was only one little area that I need to talk to the children about. One-third, one-third, one-third.

?:      Uhm um.

MRS. STEFFENBERG:      Any gifts that we have given, like I know what I mean and I know what you mean....

GILMAN:      Right. There is at least one gift that we know of at the moment and that will be provided for ....

MRS. STEFFENBERG: That will be deducted from.............

SCOLL:      That will be deducted from the portion of the child who receives it.

GILMAN:      I mean it's always going to equal one-third. It is our job to figure it all out for you.

MRS. STEFFENBERG: So the bottom line it will still be...........

GILMAN:      Exactly the same. Equal.

MRS. STEFFENBERG: Okay.

SCOLL: Okay. I think I'm done unless anybody has any other questions.

MR. STEFFENBERG:      That was good David. You did good.

SCOLL: Thanks.

MRS. STEFFENBERG: Would you like more tea?

SCOLL: No that's alright.

GILMAN: Alright let me just give you...A.J. This is Gene Gilman and I handle the investment program for your parents. Let me just first say that we are not going to get into a talk about the amount of money that is involved in the estate or any of the trusts at this time and only for one major reason is that we don't want you to have any preconceived ideas about how much money is involved or what you are going to get. Your lives should not change at this stage because of what you might anticipate. In addition, we don't know what it is really going to look like on the back end because you know these two guys can go out 30 years from now and if they do, I have no idea what sort of portfolio would look like or what the tax laws would look like or any of those

things. So I think that the reason for our meeting obviously is to discuss (a) the legal issues and then just to give you some idea that we have spent an enormous amount of hours trying to design a program that will meet your parents' needs during their lifetime. That is the primary concern for the development of the investment program. The issue of passing that on to the next generation which are your children has popped up to be being one of the very important issues to both of you.

MR. STEFFENBERG: Excuse me. I might add that Gene has done a great job since we started with him and taking care of their investments so that we can go on money to live on without depleting the principal so to speak because he has done such a job of earning money with this program that he worked many hours on with us and Sam Crissman is in the program too. He has a separate program for Sam so we have obviously we have trust in Gene and also David.

GILMAN: Well I appreciate that. Thank you. You guys have done a really good job to listen and this has been a whole new world for them and we want you all to understand that the program has really been designed to meet their living needs and that we have encouraged them not to be excessive in having entered into principle because we just don't know what it is going to look like 5 years or 10 years from now and therefore at the moment, without getting into numbers and how they work and where they're at – we really feel that they are there from a standpoint of a balance between a daily operating needs and expenses and where their principal is and that we really need to settle in based on all of the…..remember, we are going to give ourselves a couple years after the sale of the business and let things kind of smooth themselves out – you know we went and got the Maine property. We went and did some things from next door from the stand point for setting up some protection in the future for both of them and having you next door to help them out. That was really one of the major reason we are doing some of this and that the amount of money that is now sitting in their investment program really meets their needs plus or minus how we do in the various different investments that we have and I think that until we see within the next two or three years how things go we don't really see – they really shouldn't be tapping into anything more from this (inaudible) principal.

MR. STEFFENBERG:        He's tough to get a raise out of. We want to get some money – my money…..he won't give it to me.

GILMAN:        I really…I mean you know we really designed a very conservative program. It's been – we've done what we call asset allocation so that it has a wonderful mixture of money that is protected where things might get adjusted in the stock market that we are not aware of which should have effect anything to any great degree but yet there is a decent amount of growth that is built into the program so that 30 years from now they can look at me and say, wow this thing grew and now I feel a lot more comfortable with being able to you know do a little bit more for my children now but I think you should all understand where it is at at this stage, okay/

MR. STEFFENBERG:        These gentlemen are doing their job; they've talked with us. What else can we say. Are you finished? Go home!

GILMAN:    I'm finished. I don't know what I can say. I would like to say that if we get a little lucky over the next few years and we do an exceptionally good job then I think it's up to you guys to decide when and if there is anything you want to do. But right now I wouldn't encourage it. Especially, since Clinton just got re-elected and who knows what's going to happen the next four years.

MR. STEFFENBERG: I have this thing in the back of my mind all the time that I got to get it out of there but I like to own property because I think owning property down the road you sell it you can make a good buck. You can also lose a good buck too, I understand it. But, like the house next door to us in Maine. I want that thing because it's been sitting there.

GILMAN: You still do, don't you?

MR. STEFFENBERG: I want it. But I can't afford to buy it.

GILMAN: Yeah.

MR. STEFFENBERG: I mean I could but I would be eating hotdogs the rest of my life.

GILMAN: We did work through the numbers in fact only because you know he loves his privacy and he was really looking out for you guys again and is this a good investment for the future for everyone or are we (inaudible). We spent a lot of time going over that one.

MR. STEFFENBERG: He tells me – well you can do this Arthur but however, you like hotdogs and baked beans couple days a week – that's what you are going to do. I said nah, I like a little steak once and awhile so we forgot about it but it's sitting there . They just dropped the price $50,000 bucks.

NANCY MALOUGHNEY: Is it still for sale?

MR. STEFFENBERG: Yeah. It was $500,000 – now it's $450,000.

GILMAN: Interesting. I think that you know real estate becomes a real issue. You know you can buy in Leominster which is a completely different listing market than Maine is and is certainly a different real estate market than Newton or Weston.

MR. STEFFENBERG: Oh yeah.

GILMAN: Then it becomes a different issue and frankly there is a lot of real estate in this family at the moment.

NANCY MALOUGHNEY: Even buying that house next door as a business would it make any difference in (inaudible).

GILMAN: As a business?

NANCY MALOUGHNEY: Like a bed and breakfast business?

MR. STEFFENBERG: She's talking in Maine.

NANCY MALOUGHNEY: In Maine.

GILMAN: Oh the Maine house? Hard to say. Depends on what the financials would look like on running the business. See the key is are there some B&Bs in that area and would they work. Those are always a big time question marks on doing things of that nature.

SCOLL or MR. STEFFENBERG:    If you made a profit, it's always a question of whether or not the profits of a B&B would be as much as the profits from the money used as an investment on a vehicle.

Taxes and all. If it was losing money then the question is whether or not the tax benefit from the losses would be enough to offset the gains that you made by having the money invested in other places. So……..

GILMAN: And at the moment, frankly, it doesn't really work in this program. It really makes it more difficult. Unless you can look yourself in the eye and say wow this is a good business and we know that the "x" amount of money would fly in from the B&B. I do know that there are B&Bs that have been up there that have not been successful. The part of the reason is because of the high cost of the real estate.

MR. STEFFENBERG: Find the people. Don't you have to hire people.

GILMAN: Well no – those are the business aspects of it all. You're just talking about the payments of the real estate and the taxes and the upkeep. That alone starts you off in the business that has a pretty high overhead.

MRS. STEFFENBERG:    And you don't have 12 months of business.

GILMAN: Right right.

MR. STEFFENBERG:    Three months, three and one half …. So people rent them up there for $2000.00 week right along that strip. That's what they rent their houses for those who rent. So you get $2000 week next door but that would only pay the taxes probably from the house and not the principal be (inaudible).

GILMAN: ...(inaudible) has a B&B and B&Bs are very difficult. They are really a difficult line of property. But then again it is a question mark.